AO 108 (Rev. 06/09) Application for a Warrant to Seize Personal Property Subject to Forfeiture AUTHORIZED AND APPROVED/DATE:  D.H. Dilbeck/5/8/2025

# UNITED STATES DISTRICT COURT
### for the

WESTERN _____ DISTRICT OF_____ OKLAHOMA _____

| | | |
|---|---|---|
| **In the Matter of the Seizure of** | ) | |
| The cash value of the contents of Bank of America | ) | |
| Account Number **139104260251**, | ) | Case No:   M-25-299-SM ____ |
| in the name of Xian Long Ruan, | ) | |
| maintained in the possession and control of the U.S. | ) | |
| Government. | ) | |

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, Jose Moreno, a federal law enforcement officer for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property is subject to forfeiture to the United States of America under 18 U.S.C. § 981(b) and 28 U.S.C. 2461(c), as incorporated by 21 U.S.C. § 881(b), 18 U.S.C. § 981(a)(1)(A) and (a)(1)(C); 18 U.S.C. § 982(a)(1) and 21 U.S.C. § 853(f), as incorporated by 18 U.S.C. § 982(b)(1), for violations of 21 U.S.C. §§ 846 and 881(a)(6); and 18 U.S.C. §§ 1956 and 1957:

> **The cash value of the contents of Bank of America Account Number 139104260251, in the name of Xian Long Ruan, maintained in the possession and control of the U.S. Government.**

The application is based on these facts:

See attached Affidavit of Agent Richard Paulk, of the Oklahoma Bureau of Narcotics, which is incorporated by reference herein.

☒   Continued on the attached sheet.

_____
*Applicant's signature*
JOSE MORENO, Task Force Office
Drug Enforcement Administration

Sworn to before me and signed in my presence.

Date:  ___May 9, 2025___

_____
*Judge's signature*

City and State:  Oklahoma City, Oklahoma

Suzanne Mitchell, U.S. Magistrate Judge
*Printed name and title*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **IN THE MATTER OF THE SEIZURE OF FUNDS SEIZED FROM THE RESIDENCE AND VARIOUS BANK OF AMERICA AND CHASE BANK ACCOUNTS ASSOCIATED WITH XIAN RUAN** | **Case No.** ___M-25-299-SM___ <br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEIZURE WARRANT

I, Richard Paulk II, Agent of the Oklahoma Bureau of Narcotics ("OBN"), being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am currently an agent with OBN assigned to the Special Investigations Section of the OBN Oklahoma City District Office and have been employed by OBN since April of 2012. Since becoming an OBN agent, I have been involved in a wide variety of investigative matters, including numerous investigations targeting large criminal enterprises, most of which involved the unlawful distribution of narcotics in violation of 21 U.S.C. §§ 841(a)(1) and 846. I have completed over 1,400 hours of law enforcement training, including significant training through OBN related to the investigation of drug trafficking and money laundering organizations. Further, I have participated in many aspects of criminal investigations, including surveillance, applying for and executing search warrants, executing

arrest warrants, conducting probable cause arrests, and interviewing and debriefing defendants, informants, and other witnesses. I have also worked with other local and federal law enforcement officers regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs. Through my training and experience, I have become familiar with some of the methods by which illegal drugs are imported, distributed, and sold, as well as the means by which drug traffickers will then "wash" (i.e., launder) their illicit proceeds in order to disguise the source and nature of their profits.

2.      The facts set forth in this Affidavit are based upon my personal observations, my training and experience, reports provided to me by other law enforcement officers, and statements made by witnesses and other concerned parties. Since this affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrants, I have not included each and every fact known to me concerning this investigation.

## CASE BACKGROUND

3.      I make this affidavit in support of eight seizure warrants for money that was seized from the residence and bank accounts associated with XIAN RUAN totaling $619,838.13. This money was originally seized by OBN pursuant to state search and seizure warrants. OBN then filed state civil

forfeiture proceedings that were consolidated into one proceeding in Oklahoma County Case Number CJ-2022-3000, which involved significant civil litigation.

4.    While those civil proceedings were ongoing, the United States indicted XIAN RUAN and two co-defendants in a federal criminal case for engaging in a drug conspiracy and money laundering conspiracy.    The indictment included forfeiture allegations against all three defendants.    All three defendants are currently pending trial in case number 24-403-PRW before Judge Patrick Wyrick.    Following the indictment, the United States Attorney's Office for the Western District of Oklahoma adopted OBN's forfeiture and took possession of funds subject to forfeiture including the $619,838.13 seized from accounts and property associated with XIAN RUAN.

5.    While the United States did not obtain federal seizure warrants before taking possession of the funds from OBN, those funds were seized by OBN pursuant to state warrants.    The sufficiency of those warrants has not been challenged by XIAN RUAN in this case.    In fact, in a filing, XIAN RUAN conceded that OBN held the funds "pursuant to a valid warrant."    ECF 49 at 7.    While XIAN RUAN has not challenged the sufficiency of the state warrants, he argued that the United States unlawfully took possession of those funds, because it did not obtain seizure warrants before taking possession of those funds from OBN.    *See id.*

6.     On May 2, 2025, in response to that motion by XIAN RUAN seeking return of the property, Judge Wyrick ordered the United States to obtain a criminal seizure warrant pursuant to 21 U.S.C. § 853(f) by May 12, 2025, to maintain lawful possession of the assets.  ECF 61 at 11.  If the United States fails to obtain a warrant, it was ordered to return the $619,838.13 to XIAN RUAN.  *Id.*  Thus, I am submitting this affidavit in compliance with that order in support of criminal seizure warrants.

## PROPERTIES SUBJECT TO FORFEITURE

7.     The United States submits this affidavit in support of forfeiture of the following accounts and cash amount, altogether referred to as the "**SUBJECT ACCOUNTS**":

  a.   contents of Bank of America account ending in 0251 totaling $16,334.39 currently in possession of the United States government. ("**SUBJECT ACCOUNT 1**");

  b.   contents of Bank of America account ending in 3606 totaling $3,784.32 currently in possession of the United States government. ("**SUBJECT ACCOUNT 2**");

  c.   contents of Bank of America account ending in 3825 totaling $113,514.39 currently in possession of the United States government. ("**SUBJECT ACCOUNT 3**");

  d.   contents of Bank of America account ending in 0264 totaling $668.07 currently in possession of the United States government. ("**SUBJECT ACCOUNT 4**");

e.  contents of Bank of America account ending in 3014 totaling $19,515.55 currently in possession of the United States government. ("**SUBJECT ACCOUNT 5**");

f.  contents of Chase bank account ending in 0610 totaling $404,350.37 currently in possession of the United States government ("**SUBJECT ACCOUNT 6**");

g.  contents of Chase bank account ending in 0725 totaling $15,193.04 currently in possession of the United States government ("**SUBJECT ACCOUNT 7**"); and

h.  $46,478.00 in United States currency seized from the residence of XIAN RUAN and currently in possession of the United States government ("**CASH AMOUNT**").

## BASIS FOR SEIZURE

8.  Under 18 U.S.C. § 981(b), property subject to forfeiture under Section 981 may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," and may be executed "in any district in which the property is found," if there is probable cause to believe the property is subject to forfeiture. Section 982(b)(1) incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for all stages of a criminal forfeiture proceeding. Section 853(f) permits the Government to request the issuance of a seizure warrant for property subject to criminal forfeiture.

9.  These Applications seek seizure warrants under criminal authority because the property to be seized could easily be placed beyond process if not

5

seized by warrant, as money is fungible and easily dissipated. A restraining order is thus insufficient to ensure the availability of assets likely subject to forfeiture.

10.    The United States alleges that the **SUBJECT ACCOUNTS** are subject to forfeiture to the United States because they constitute property that is involved in money laundering, are used or intended to be used to facilitate the commission of criminal activity, and are proceeds of unlawful drug activity or proceeds traceable to unlawful drug activity in violation of the Controlled Substances Act. Specifically, the United States alleges that the **SUBJECT ACCOUNTS** are forfeitable to the United States pursuant to use and involvement in violations of 18 U.S.C. §§ 1956 and 1957 (money laundering) and 21 U.S.C. §§ 846 (drug conspiracy).

11.    Title 18, United States Code, Section 1956 makes it a crime for any person to knowingly conduct, or attempt to conduct, a financial transaction with proceeds from a "specified unlawful activity" ("SUA") intending to promote the SUA or evade taxes or knowing the transaction is designed in whole or part to conceal or disguise the nature, location, source, ownership or control of the proceeds or to avoid a transaction reporting requirement.

12.    Title 18, United States Code, Section 1957 makes it a crime for any person to engage in monetary transactions in property derived from specified

unlawful activity in an amount greater than $10,000 by, through, or to a financial institution.

13.     Title 21, United States Code, Section 846 makes it a crime to conspire to violate a provision of Title 21, that is, Section 846 provides that any person who attempts or conspires to commit any offense defined in that subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

## BACKGROUND ALLEGATIONS REGARDING DRUG CASES AND MONEY LAUNDERING

14.     As discussed previously, I am, based on my training and experience, as well as the training and experience of other investigators in this case with whom I have consulted, familiar with the *modus operandi* of drug trafficking organizations (DTOs).  I am also familiar with many ways in which DTOs will attempt to launder their illicit proceeds.  Based on my training and experience, and participation in other money laundering and drug-related investigations, I know the following:

a)     I am aware that money launderers connected to DTOs frequently keep assets, records, documents related to their transfer activities, and monies derived from the sale of illegal narcotics at private residences and businesses, sometimes acting in a "shell" capacity, where they are not easily detectable by law enforcement officials conducting investigations, and further that these individuals will frequently

7

maintain these locations in the name of other individuals, also to avoid detection by law enforcement agencies;

b)      I am aware that money launderers connected to DTOs often own and operate seemingly legitimate businesses, sometimes hidden within larger businesses, and that money launderers often commingle lawful monetary transfers with unlawful transactions;

c)      I am aware that even though those businesses and properties are under an alias or other persons' names, money launderers continue to use and exercise dominion and control over them.  Money launderers often select third parties who they trust to list as the owners of assets derived from drug trafficking.  This ensures that the third party will not steal or otherwise interfere with the assets they, in theory, maintain access to.  Specifically, drug traffickers and money launderers often use their spouse or businesses controlled by their spouse to hold assets derived from drug trafficking;

d)      I am aware that money launderers connected to DTOs often maintain on-hand quantities of currency, often derived from unlawful activities such as drug-trafficking, to methodically transfer the funds, sometimes by "structuring", often over prolonged periods of time, to avoid law enforcement detection and financial reporting requirements;

8

e)    I am aware that while drug traffickers and money launderers often use banks and businesses to store assets derived from drug trafficking, they often maintain cash supplies at their residence as an emergency cache in the event the funds held in banks or businesses are seized by law enforcement or stolen by rivals or co-conspirators;

f)    I am aware that money launderers connected to DTOs maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the receipt, transfer, and storage of financial instruments related to unlawful activities, even though such documents may be in code. It is particularly common that individuals engaged in money laundering connected to DTOs will keep ledgers related to their illegal activity because drug dealers commonly deposit large amounts of currency, often multiple times per week, and the money launderers often deal with more than one DTO at any particular time;

g)    I am aware that the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where the money launderers have ready access to them, i.e., homes, automobiles, businesses and safe houses, and that the most common place for these items to be located is at the businesses used to execute the unlawful monetary transfers. Further, I know that money launderers associated

with DTOs often keep these records for significant periods of time, as sometimes an accounting can be required;

h)    I am aware that it is common for money launderers connected to DTOs to conceal contraband, proceeds of drug sales, and records related to drug proceeds or drug proceeds transfers in hidden locations within their residences for ready access, and to conceal such items from law enforcement agencies;

i)    I am aware that to accomplish the overall goals of distribution of currency for DTOs, money launderers utilize, including but not limited to, banks and their attendant services, securities, cashier checks, money drafts, letters of credit, brokerage houses, real estate companies, money orders, shell corporations, and business fronts;

j)    I am aware that money launderers often use multiple bank accounts, including business, personal, checking, and savings accounts to spread out their assets. This makes their activities more difficult for law enforcement to track and reduces the likelihood of law enforcement seizing all of the money launderer's assets at once.

k)    I am aware that once law enforcement seizes funds from bank accounts utilized by money launderers, the money launder will often attempt to open, move, or spread out remaining assets to protect those assets from additional seizures. This may include opening new

bank accounts or diversifying and comingling the assets with real property purchases, businesses, cash, or other assets.

## **PROBABLE CAUSE**

### **Conduct Described in Indictment**

15.     The indictment charges XIAN RUAN and his co-defendants DAO KUN FENG and XIU PING HUANG with conspiring together to traffic marijuana, and DAO KUN FENG and XIAN RUAN with conspiring to launder drug proceeds, between October of 2019 and January 17, 2024. The indictment describes the following conduct in its manner and means sections. XIAN RUAN, along with his co-defendants, owned PING Green, LLC and PING Green Two, LLC. Both of those LLCs operated illegal marijuana grows in the Western District of Oklahoma in violation of Oklahoma state law during the charged conspiracy.

16.     DAOFENG, LLC, was an Oklahoma limited liability company incorporated on July 10, 2019. It was owned by DAO KUN FENG. That LLC maintained a business checking account (ending x2273) at JPMorgan Chase Bank (the "DAOFENG, LLC Chase Account") since in or about August 2019.

17.     DAO KUN FENG opened the DAOFENG, LLC Chase Account and was initially its sole signatory. In or about October 2019, XIAN RUAN was added as a signatory on the DAOFENG, LLC Chase Account.

11

18.    Since at least January 2020, DAOFENG, LLC operated a garden supply store in Oklahoma City named Green World Garden Supply. DAO KUN FENG, through DAOFENG, LLC, owned Green World Garden Supply. XIAN RUAN was its self-identified day-to-day manager.

19.    Green World Garden Supply purported to lawfully sell garden supplies, primarily products needed by marijuana growers. In truth, DAO KUN FENG and XIAN RUAN also used the business to launder proceeds from the unlawful cultivation and distribution of marijuana in Oklahoma.

20.    In addition to the above referenced JP Morgan Chase Bank business checking account (ending x2273), DAOFENG, LLC, doing business as Green World Garden Supply, maintained a business checking account (ending x2085) at Valliance Bank (the "DAOFENG, LLC Valliance Account"). DAO KUN FENG opened the DAOFENG, LLC Valliance Account on or about November 10, 2020, and said account was open until May of 2021. DAO KUN FENG and XIAN RUAN were signatories on the account.

21.    In the first two weeks after opening the DAOFENG, LLC Valliance Account, DAO KUN FENG and XIAN RUAN deposited approximately $1,887,510.00 in cash into the account. Over the next five months, DAO KUN FENG and XIAN RUAN continued this pattern of high-volume cash deposits. In total, from November 2020 through May 2021, DAO KUN FENG and XIAN RUAN deposited $20,949,569.00 in cash into the DAOFENG, LLC Valliance

Account, derived in part from the unlawful cultivation and distribution of marijuana.

22.    After depositing this cash into the DAOFENG, LLC Valliance Account, DAO KUN FENG and XIAN RUAN conspired to transfer a portion of the proceeds into the DAOFENG, LLC Chase Account.  To accomplish this transfer into Chase Bank, DAO KUN FENG and XIAN RUAN primarily used checks and cashier's checks made out to DAOFENG, LLC.

23.    In total, from November 2020 through May 2021, DAO KUN FENG and XIAN RUAN transferred at least $2,410,500.00 from the DAOFENG, LLC Valliance Account to the DAOFENG, LLC Chase Account.

24.    DAO KUN FENG and XIAN RUAN further conspired to transfer, via international wire, proceeds from their unlawful activities that they had deposited into the DAOFENG, LLC Chase Account.  From November 2020 through May 2021, DAO KUN FENG and XIAN RUAN, as signatories on the DAOFENG, LLC Chase Account, transferred by international wire at least $873,495.50 from the DAOFENG Chase Account to financial institutions and various entities in China, Hong Kong, and Canada.

25.    Additionally, DAO KUN FENG and XIAN RUAN conspired to use both the DAOFENG, LLC Chase Account and DAOFENG, LLC Valliance Account to purchase items from domestic companies who sell products used for the cultivation of marijuana.  In purchasing such items, DAO KUN FENG and

XIAN RUAN conspired to transmit and transfer funds from the DAOFENG, LLC Chase Account and DAOFENG, LLC Valliance Account with the purpose of carrying on their unlawful cultivation and distribution of marijuana.

26.    In accordance with hand-written ledgers and financial documents, the massive cash deposits, channeled into Green World Garden Supply as well as its business bank accounts, were also funneled out to a variety of other individuals, including international recipients, various individuals associated with black-market grows, related members of the conspiracy residing in other states, and for other purposes associated with the black-market marijuana grows. Cash was directed into the DAOFENG, LLC Valliance Account and then back out, ultimately to these recipients, so that the payments would appear to have been made by Green World Garden Supply, which could conceal that that the true nature and source of the payments was from black-market marijuana sales.

## Additional Background Regarding RUAN and FENG Activities

27.    In November of 2015, XIAN RUAN and his wife, Zhen Shan Liu, formed Pao Pao, Inc., a horticultural grow supply store in or around Denver, Colorado. XIAN RUAN owned the business and his wife was the registered agent. In January of 2019, the Drug Enforcement Administration ("DEA") in Colorado conducted a controlled purchase of two pounds of marijuana from XIAN RUAN for $2,400 at the Pao Pao, Inc., marijuana grow supply store. At

some point after that controlled purchase, XIAN RUAN and his wife, Zhen Shan Liu, relocated to Oklahoma.

28. It should be noted that according to an "E-Filed" Articles of Incorporation for a Profit Corporation, filed on December 10, 2018, the same address as Pao Pao Inc, was also the principal office address for RF Inc, a business owned 50% by XIAN RUAN and 50% by DAO KUN FENG, officially connecting the business interests of the XIAN RUAN and DAO FENG prior to their arrival in Oklahoma.

29. By 2021, XIAN RUAN and DAO KUN FENG had again become business partners, this time in Oklahoma marijuana grow operations and the Green World Garden Supply store. As referenced in the indictment, XIAN RUAN and DAO KUN FENG were co-owners in PING Green, LLC and Ping Green TWO, LLC, both companies that controlled marijuana grows in central Oklahoma.

30. Based on my training, experience, and knowledge of this investigation, I believe that the grows owned, in part, by XIAN RUAN generated significant cash revenue from the illegal sale of marijuana for XIAN RUAN and his co-owners. For example, a handwritten ledger recovered from the home of one of XIAN RUAN's co-defendants, and a co-owner of PING Green, LLC appeared to indicate that XIAN RUAN was entitled $444,360 generated by marijuana grows over an unstated period. Further, XIAN RUAN

15

and DAO KUN FENG, each separately and routinely deposited literal boxes of U.S. Currency, each in amounts ranging from $100,000 to $900,000 into the DAOFENG, LLC Valliance Account.

31.    During a search warrant at Green World Garden Supply conducted on May 24, 2021, XIAN RUAN was present and identified himself to me as the manager of the business. OBN Agents found over $1,000,000 in U.S. Currency, stored in a disorganized and unsecured manner in the business. During that search warrant, I also spoke with XIAN RUAN, who was unable to provide me with the price for various items in the store despite presumably having access to the store's point of sale system.

32.    Based on my training, experience, and knowledge of this investigation, I believe that XIAN RUAN and DAO KUN FENG used Green World Garden Supply to disguise drug proceeds from their marijuana grows as legitimate sales from the garden supply business. RUAN's inability to quote prices on various legitimate products is consistent with those products having no set price, thus leaving room to inflate sales or deflate costs of the business to explain the business's massive revenue stream, which in reality, was comingled with drug proceeds.

33.    This is further supported by OBN's interview with agents of two competing garden supply stores, Organics OKC and Grow Generation (Source 1 and Source 2), both of which were operating in central Oklahoma in 2020-

16

2022 and aware of Green World Garden Supply. Both Organics OKC and Grow Generation appeared at least as large and appeared to contain as many or more products as Green World Garden Supply. Source 1 stated that Organics OKC, in its best year, totaled gross sales of $4 million. Source 1 further said that he/she did not believe there was any way Green World Garden Supply was able to sell over $10 million of products. Source 1 said that the only business capable of annual sales of over $10 million was Grow Generation, which operated multiple stores across different locations. Source 2, who worked for Grow Generation, said that Source 2's store expected to sell between $2 and $3 million worth of product annually. Source 2 said that even a store four times the size of Source 2's store would be unable to sell over $10 million worth of product in one year. Source 2 further stated that he/she heard rumors from customers about Green World Garden Supply laundering money for Chinese run marijuana grows and distributing marijuana through the back of the store.

34.    The interviews with Sources 1 and 2 further cast doubt on the legitimacy of the more than $20,000,000 that flowed through Green World Garden Supply's DAOFENG, LLC Valliance Bank account, which to which RUAN had full access, in only seven months between November 2020 and May 2021.

35.    Due to the large number of cash deposits over $10,000 into the DAOFENG, LLC Valliance account, described in paragraph 30 above,

17

Valliance Bank, as a "financial institution," filed dozens of mandatory banking reports with the Internal Revenue Service ("IRS").[1]  Although Green World Garden Supply is not a "financial institution," they are still required by 31 U.S.C. § 5331 and 31 C.F.R. § 1010.330 to file reports with the IRS for cash transactions over $10,000.  However, Green World Garden Supply never filed any mandatory reports documenting the cash intake which comprised those large deposits.  Given the sheer number of large cash deposits, it is not realistic that the amounts deposited were all comprised of unrelated cash payments received by Green World Garden Supply under $10,000.  I know based on my training and experience that businesses seeking to conceal the nature, origin, or control of its funds will choose not to file mandatory reports with the IRS, as the filing invites scrutiny, in violation of 31 U.S.C. § 5331 as well as 18 U.S.C. § 1956 and § 1957.

**Additional Details Regarding the SUBJECT ACCOUNTS**

36.    **SUBJECT ACCOUNT 1** was opened at Bank of America by XIAN RUAN, as the sole signer, on May 31, 2021, following OBN's seizure of funds from the DAOFENG, LLC Valliance Account on May 20, 2021.  The next day, June 1, 2021, XIAN RUAN funded **SUBJECT ACCOUNT 1** with a

---

[1]    Under 31 U.S.C. § 5313 and its implementing regulations, banks and other "financial institutions" (as defined in the statute, 31 U.S.C. § 5312(a)(2), and the regulations, 31 C.F.R. § 1010.100(t)) are required to file a report with the Internal Revenue Service for cash transactions in excess of $10,000.

$116,111.79 check from a Chase bank account in his name. During 2021, XIAN RUAN's **SUBJECT ACCOUNT 1** saw deposits of $274,189. Among other reasons, I find this deposit amount suspicious because tax documents for XIAN RUAN and his wife reflect that their 2021 adjusted gross income was only $36,000.

37.     Many of the deposits into **SUBJECT ACCOUNT 1** were unusual in that they were large amounts occurring in irregular increments for no apparent legitimate purpose. For example, during September of 2021, **SUBJECT ACCOUNT 1** received two $60,000 checks from an individual in Rosemead, California. In October of 2021, **SUBJECT ACCOUNT 1** received a $15,000 check from Zhiyuan He, an employee of Green World Garden Supply, who was presumably under the supervision of XIAN RUAN. **SUBJECT ACCOUNT 1** also received checks of $25,000 from a company in Centennial, Colorado called East Moon 9, Inc. and its owner Jeane Yang.

38.     **SUBJECT ACCOUNT 1** also saw unusual withdrawals including a cash withdrawal by XIAN RUAN on June 23, 2021, of $97,037. Further, on July 16, 2021, XIAN RUAN wrote a $30,000 check to his wife, who less than two weeks before, had wired $30,000 to an agent of Zenith Associates. I believe, based on my investigation, training, and experience, that Zenith Associates is a consulting group that specialized in connecting Oklahoma citizens with out-of-state marijuana traffickers for the purpose of bypassing

Oklahoma's residency requirement and obtaining licenses for cultivating marijuana. Further, based on my knowledge of the investigation, I know that XIAN RUAN and wife were, at one time, partial owners of Zenith Associates.

39.     On July 30, 2021, XIAN RUAN's wife, Zhen Shan Liu, deposited the $30,000 check XIAN RUAN wrote her from **SUBJECT ACCOUNT 1** into her bank account, **SUBJECT ACCOUNT 2**. Less than two months later, on August 17, 2021, Zhen Shan Liu moved $30,000 from **SUBJECT ACCOUNT 2** into the recently opened **SUBJECT ACCOUNT 3**. Based on my training, experience, and knowledge of this investigation, I believe that the check from XIAN RUAN to Zhen Shan Liu was repayment for her payment to Zenith Associates, which was in furtherance of XIAN RUAN's attempts to illegally cultivate and traffic marijuana. I further believe that Liu's movement of that money from one Bank of America account to another is consistent with a person trying to hide and protect proceeds of unlawful activity.

40.     **SUBJECT ACCOUNT 3** was opened on August 17, 2021, by XIAN RUAN's wife, Zhen Shan Liu, the same day she transferred $30,000 from **SUBJECT ACCOUNT 2**. Based on my investigation, training, and experience, I believe that **SUBJECT ACCOUNT 3** was opened for the purpose of creating an account to move the $30,000 payment from XIAN RUAN associated with his and his wife's dealings with Zenith Associates. I further believe that the $113,514.39 seized from **SUBJECT ACCOUNT 3** is

inconsistent with a person's bank account who, in combination with her husband, never reported to the IRS to have earned more than $60,000 in a calendar year during 2020, 2021, or 2022. Per XIAN RUAN and his wife's tax records, their adjusted gross income during those years was $57,759, $36,000, and 36,336, respectively.

41.    **SUBJECT ACCOUNT 4** was opened by XIAN RUAN on the same day he opened **SUBJECT ACCOUNT 1**, following OBN's seizure of over $1.6 million from the DAOFENG, LLC Valliance Account. **SUBJECT ACCOUNTS 1 and 4** were combined onto one statement. **SUBJECT ACCOUNT 1** was set up to automatically transfer $25 per month into **SUBJECT ACCOUNT 4**, continuously connecting the two accounts.

42.    **SUBJECT ACCOUNT 5** was opened by XIAN RUANS's wife, Zhen Shan Liu, on July 21, 2021, under the name Shanwater, LLC, an Oklahoma registered LLC, incorporated on June 21, 2021. Many deposits into **SUBJECT ACCOUNT 5** appear consistent with **SUBJECT ACCOUNT 5** receiving rental income from a residential property in Norman, Oklahoma. This is significant because that property was purchased by Shanwater, LLC in September of 2021, in part, via a $168,788 wire transfer from **SUBJECT ACCOUNT 5**. Like several other **SUBJECT ACCOUNTS**, I believe that the opening of **SUBJECT ACCOUNT 5,** the subsequent transfers into **SUBJECT ACCOUNT 5,** and even the purchase of the residential property, soon after

OBN seized over $1.6 million from the DAOFENG, LLC Valliance Account, is consistent with an attempt to protect and disguise the nature, source, or ownership of drug proceeds, and ultimately attempting to thwart the detection and seizure by law enforcement.

43.   Based on my knowledge of the investigation, my training and experience, I believe that **SUBJECT ACCOUNT 5** just having $168,788 available for the purchase of the residential property in Norman, Oklahoma would be inconsistent with a person's bank account who, in combination with her husband, never earned more than $60,000 in a calendar year during 2020, 2021, or 2022, and who claimed to not work, but to be a full time student.

44.   **SUBJECT ACCOUNT 6** was opened by XIAN RUAN's wife, Zhen Shan Liu, on May 14, 2014.   During the period of the charged conspiracy, deposits into **SUBJECT ACCOUNT 6** were unusual in that they were large amounts occurring in irregular increments for no apparent legitimate purpose. In fact, since December 28, 2020, **SUBJECT ACCOUNT 6** received nine deposits totaling over $326,000.

45.   Two of those nine deposits into **SUBJECT ACCOUNT 6** came from transfers in June of 2021 from XIAN RUAN's Chase Bank account ending in 2321 and totaled $123,461.   Those two transfers effectively closed XIAN RUAN's account ending in 2321.   This is significant because XIAN RUAN used the Chase account ending in 2321 in dealings with DAO KUN FENG.   For

example, in 2018, DAO KUN FENG gave XIAN RUAN a $20,000 cashier's check, which Zhen Shan Liu deposited into Chase Account 2321. Account 2321 also contained deposits that I know to be consistent with structured transactions associated with money laundering including three $9,000 checks from the same person, each deposited into Chase account 2321 on March 3, 2021, and five money orders totaling $4,500, each for $900[2], which were deposited into Chase Account 2321 on June 1, 2021. Furthermore, **SUBJECT ACCOUNT 6** had continually received deposits from Pao Pao, Inc., the Colorado based marijuana grow supply store from which RUAN illegally sold marijuana during the controlled purchase completed in January 2019.

46.    Based on my training, experience, and knowledge of this investigation, I believe that the June 2021 $123,461 transfer from XIAN RUAN's Chase account ending in 2321 into his wife's **SUBJECT ACCOUNT 6** and the comingling of those funds with existing funds in **SUBJECT ACCOUNT 6** was an attempt to protect and disguise drug proceeds in response to OBN's seizure of over $1.6 million from the DAOFENG, LLC Valliance Account.

---

[2]    Under 31 U.S.C. § 5325 and its implementing regulations, "financial institutions" (as defined in the statute, 31 U.S.C. § 5312(a)(2), and the regulations, 31 C.F.R. § 1010.100(t)) are required to obtain identification information from individuals when acquiring a bank check, cashier's check, traveler's check, or money orders over $3,000 on the same day, whether it be a single transaction or a group of contemporaneous transactions.

47.    Additional suspicious deposits during the charged conspiracy into **SUBJECT ACCOUNT 6** include $34,980 and $39,985 wire transfers from China Construction Bank in December of 2020 and May of 2022, a $20,000 cashier's check from Lone Tree, Colorado, two $10,000 checks from East Moon 9, Inc., and an $85,700 check from an individual in Denver, Colorado.

48.    Similar to **SUBJECT ACCOUNT 3**, I believe that the $404,350.37 seized from **SUBJECT ACCOUNT 6** is inconsistent with a person's bank account who, in combination with her husband, never earned more than $60,000 in a calendar year during 2020, 2021, or 2022.

49.    **SUBJECT ACCOUNT 7** was opened by XIAN RUAN's wife on July 14, 2015. **SUBJECT ACCOUNTS 6 and 7** were combined onto one statement. During the period of the charged conspiracy, deposits and withdrawals into and from **SUBJECT ACCOUNT 7** included several transactions between **SUBJECT ACCOUNT 7** and XIAN RUAN's Chase account ending in 2321 including a period from April 8, 2021, to April 14, 2021, where $70,000 was transferred back and forth from **SUBJECT ACCOUNT 7** to XIAN RUAN's Chase account ending in 2321, through four separate transactions.

50.    **SUBJECT ACCOUNTS 2, 3, 5, 6, and 7** were, on paper, controlled by XIAN RUAN's wife.  However, I know based on my training and experience, that drug traffickers and money launderers often place assets in

24

the names of trusted third parties or entities. This is especially true where, as here, law enforcement has already seized assets of the drug trafficking organization. **SUBECT ACCOUNTS 2, 3, 5, 6, and 7** include high-dollar suspicious interactions with accounts associated with XIAN RUAN and DAO KUN FENG further supporting the comingling of those accounts with the proceeds of the drug trafficking and money laundering.

51.    On May 24, 2022, OBN executed a search warrant at XIAN RUAN's residence in Edmond, Oklahoma. During that search warrant, agents found $46,478 in U.S. currency (the **CASH AMOUNT**). The **CASH AMOUNT** was found in the closet of the master bedroom, hidden in a piece of luggage. Based on my training and experience, I believe that this amount of money hidden in a closet is consistent with how drug traffickers often store proceeds of their illegal activities. Furthermore, as stated above, while drug traffickers and money launderers often use banks and businesses to store assets derived from drug trafficking, they often maintain cash supplies at their residence as an emergency cache in the event the funds held in banks or businesses are seized by law enforcement or stolen by rivals or co-conspirators. During an interview with XIAN RUAN on the scene of this search warrant, RUAN told me that he was working at a new grow supply store called Hydro Easy Grow. During an interview with XIAN RUAN's wife, Zhen Shan Liu, on the scene of

this same search warrant, Liu told me that she was unemployed and a full-time student.

52.    Based on my training, experience, and knowledge of this case, I believe that the **SUBJECT ACCOUNTS** have been used to conceal and launder funds derived from illicit black-market marijuana activity. Based on my experience investigating DTOs connected to Oklahoma-based marijuana traffickers and their accompanying money laundering activities, I am aware of the sophisticated laundering techniques used by these groups, including the use of front companies and several different bank accounts in violation of 18 U.S.C. § 1956 and § 1957. Additionally, based on my training and experience, individuals and entities that consistently engage in financial transactions that obfuscate the source and ownership of their funds, or that are designed to evade reporting requirements, do so because they have some knowledge that the funds represent the proceeds of unlawful activity.

## CONCLUSION

53.    Based on the above facts and circumstances, I believe that probable cause exists that XIAN RUAN has violated 18 U.S.C. §§ 1956 and 1957 (money laundering), as well as 21 U.S.C. §§ 846 (drug conspiracy), through the aid in operation of illegal marijuana grows and the concealment of proceeds therefrom. Consequently, there is probable cause to believe that the **SUBJECT ACCOUNTS** are subject to seizure pursuant to 21 U.S.C. § 853(f).

26

54.    Therefore, it is requested that the United States Attorney's Office for the Western District of Oklahoma be authorized to maintain the seizure of the contents of the **SUBJECT ACCOUNTS**.

I declare under penalty of perjury that the foregoing is true and correct this _9th_ day of May 2025.

Agent Richard Paulk
Oklahoma Bureau of Narcotics

Subscribed and sworn to before me this _9th_ day of May 2025.

Suzanne Mitchell
United States Magistrate Judge